**WEILAND, GOLDEN,**
**SMILEY, WANG EKVALL & STROK, LLP**
Evan D. Smiley, State Bar No. 161812
Reem J. Bello, State Bar No. 198840
Kyra E. Andrassy, State Bar No. 207959
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Telephone: 714-966-1000
Facsimile: 714-966-1002

Proposed Insolvency Counsel for RSM BFS Partners, a
California limited partnership, Debtor and
Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>RSM BFS PARTNERS, a California limited partnership,<br><br>       Debtor and<br>       Debtor-in-Possession.<br><br>___ Affects BRECKENRIDGE FOOD SYSTEMS, INC. Only<br>___ Affects RIVER KING, L.P. Only<br>___ Affects RIVER KING, LLC Only<br>___ Affects RSM BFS PARTNERS Only<br>_X_ Affects All Debtors. | Case No. 8:08-bk-17771 TA<br><br>Chapter 11 Case<br><br>(Jointly Administered with Case Nos. 8:08-bk-17773 TA, 8:08-bk-17773 TA, and 8:08-bk-17777 TA)<br><br>**DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING USE OF ANY CASH COLLATERAL OF SECURED CLAIMANTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declaration of John D. Gantes Filed Concurrently Herewith] |

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY**

**JUDGE, AND PARTIES-IN-INTEREST:**

RSM-BFS Partners, a California limited partnership ("RSM"), Breckenridge Food Systems, Inc., a California corporation ("Breckenridge"), River King, L.P., a California limited partnership ("River King, L.P.") and River King, LLC, a California limited liability company ("River King, LLC"), the jointly administered debtors and debtors-in-possession in the above Chapter 11 proceedings (collectively, the "Debtors"), hereby move the Court,

1                                                              EMERGENCY MOTION RE
                                                                       CASH COLLATERAL

275721.1

1 | on an emergency basis, for an order: (i) authorizing Debtors to use any cash collateral of
2 | any secured claimants, including but not limited to any cash collateral of Global Swift
3 | Funding and GE Capital (collectively, the "Lenders"), and to grant to Lenders post-petition
4 | replacement liens as and for adequate protection of Debtors' use of any cash collateral of
5 | Lenders, on the terms set forth herein; and (ii) setting a final hearing on this relief (the
6 | "Motion"). This Motion is made and based upon the foregoing allegations and
7 | representations, the Memorandum of Points and Authorities and the Declaration of John
8 | D. Gantes (the "Gantes Declaration") filed concurrently herewith, the papers, pleadings
9 | and other documents on file in Debtors' Chapter 11 cases, and upon such other evidence,
10 | both oral and documentary, that may be submitted to the Court at or before the time of the
11 | hearing on this Motion.

12 | **WHEREFORE**, Debtors request that this Court enter its order:

13 | 1.    Authorizing Debtors' immediate use of any cash collateral of the Lenders
14 | pursuant to the terms and conditions contained in this Motion, pending a final hearing on
15 | notice to creditors;

16 | 2.    Setting a final hearing on this Motion; and

17 | 3.    Granting to Debtors such other and further relief as may be just and
18 | appropriate in accordance with the circumstances of this case.

19 | Dated: November 25, 2008    WEILAND, GOLDEN
                                  SMILEY, WANG EKVALL & STROK, LLP

By: _____/s/ Reem Bello_____
    REEM J. BELLO
    Proposed Insolvency Counsel for RSM
    BFS Partners, a California limited
    partnership, Debtor and Debtor-in-
    Possession

275721.1

2

EMERGENCY MOTION RE
CASH COLLATERAL

## I. GENERAL BACKGROUND

Debtors are affiliated with approximately 50 entities owning and operating approximately 110 restaurants throughout California, Washington, and Oregon, and 60 entities owning and operating various real properties from which many of the restaurants lease space. Approximately thirteen of these affiliated cases have already been filed with the Court.

Debtors operate Burger King franchises in California and together have approximately 14 locations. Specifically, they operate the following locations:

    a.    Breckenridge Food Systems, Inc., operates locations in Irvine, Santa Ana, Aliso Viejo, Ladera Ranch, Orange, and two locations in Newport Beach.

    b.    River King, L.P., operates six Burger Kings in the Inland Empire and River King, LLC, is its general partner; and

    c.    RSM BFS Partners, a California limited partnership, operates a location in Rancho Santa Margarita.

Debtors have experienced a decline in their revenues because of the current economic climate and have fallen behind on various debts, including royalty payments to Burger King Corporation, which has issued notices of default to various of the Debtors. To prevent termination of the franchise agreements, Debtors require some breathing room from pre-petition creditors while they reorganize, close unprofitable stores as necessary, and rebuild themselves into viable businesses through the reorganization process.

### A. Financial Performance of Debtors

The following is a summary of the financial performance of each Debtor:

| DEBTOR | | 2007 | 2008 YTD |
|---|---|---|---|
| Breckenridge Food Systems, Inc. | Sales<br>Net Profit (Loss) | $ 8,435,778<br>$ 871,358 | $ 8,115,370<br>$ 871,421 |
| River King, L.P. | Sales<br>Net Profit (Loss) | $ 7,175,971<br>$ 1,140,064 | $ 6,883,047<br>$ 913,373 |
| RSM BFS Partners | Sales | $ 1,346,092 | $ 322,784 |

EMERGENCY MOTION RE CASH COLLATERAL

275721.1

| DEBTOR | | 2007 | 2008 YTD |
|---|---|---|---|
| | Net Profit (Loss) | $ 152,603 | $ 114,338 |

On a consolidated basis, Debtors generated approximately $16.95 million and $16.32 million in revenue and approximately $2,164,025 and $1,899,132 of net profit, respectively, for the year ending 2007 and 2008 YTD respectively.

### B. Secured Claims Asserted Against Debtors' Cash Collateral

The following is a summary of creditors that assert security interests against Debtors' cash collateral, along with the original loan amount:

| Debtor | Lenders | Principal Loan Amount | Collateral |
|---|---|---|---|
| Breckenridge Food Systems, Inc. | GE Capital | $880,452 | Equipment (alleged interest in cash collateral) |
| River King, L.P. | Global Swift Funding | $444,000 | Alleged interest in Cash Collateral |
| River King, LLC (Borrower for River King, L.P., the operating entity) | GE Capital | $962,000 | Equipment (alleged interest in cash collateral) |
| RSM BFS Partners | Global Swift Funding | $340,000 | Alleged interest in Cash Collateral |

### C. Events Precipitating Chapter 11 Filing

Debtors have suffered from decline in their revenues due to the current economic climate. Debtors are behind on their rent payments on their real property leases. Debtors have also fallen behind on royalty payments to Burger King Corporation and have received notices of default. To prevent termination of the franchise agreements with

Burger King Corporation while Debtors reorganize their restaurants and close unprofitable stores, as necessary, Debtors require relief under the Bankruptcy Code.

Together, the foregoing factors placed severe pressure on Debtors' cash flow, and deprived Debtors of the ability to timely pay vendor obligations, also resulting in defaults in Debtors' obligations to vendors.

### D.    Debtors' Cash Collateral Proposal

Debtors propose to use funds claimed as cash collateral by Lenders in connection with the continued operation of Debtors' businesses, in accordance with the provisions of each of Debtors' cash flow budgets attached collectively as Exhibit "2" to the Gantes Declaration. Debtors propose to use any cash collateral of Lenders pursuant to the terms and conditions set forth below:

1.    Budget. Debtors will be authorized to make the expenditures provided for in each budget monthly, and if necessary, to exceed the amounts set forth in each respective budget by as much as 115% of budget total.  However, if any of Debtor's revenues increase, then the respective Debtor's expenditures may exceed the amount of the expenditures set forth in the respective budget in proportion to the increase in actual revenues from budgeted revenues.  Any expenditures in excess of this authorization will require the written approval of each respective Lenders, or further order of the Court after appropriate notice.  Budget savings for each Debtor in any month may be carried over and used by the respective Debtor in subsequent months (i.e., to account for changes in the timing of expenditures by the respective Debtors).  After the expiration of the term of the budgets, each of Debtors will be able to obtain use of any cash collateral of the respective Lenders by filing and serving an amended budget; if no objection to the terms of such budget is filed within ten (10) days after the service of such budget, the budget will be deemed to have been approved.

2.    Replacement Lien. As adequate protection and for of Debtors' use of any cash collateral of the Lenders, each Lenders will be granted replacement liens in each of the respective Debtors' post-petition cash, accounts receivable and inventory, and the

proceeds of each of the foregoing, to the same extent and priority as any duly perfected and unavoidable liens in cash collateral held by the respective Lenders as of the date of the filing of the bankruptcy petition (the "Petition Date"), limited to the amount of any cash collateral of the respective Lenders as of the Petition Date, to the extent that any cash collateral of the respective Lenders is actually used by the respective Debtors.

3. <u>Reservation of Rights</u>. Debtors and all other parties-in-interest will reserve any and all rights that they may have to object to the claims of the Lenders and to object to the validity, priority and extent of Lenders's liens, if any, encumbering Debtors' assets.

4. <u>Financial Reporting</u>. Each of the Debtors will provide to each respective Lenders all interim statements and operating reports required to be submitted to the Office of the United States Trustee, and monthly cash flow reports, broken down by the expense line items contained in the budget, within 25 days after the end of each monthly period after the Petition Date.

5. <u>Final Hearing on this Motion</u>. Debtors reserve the right to seek, at the final hearing on this Motion, use of cash collateral different from that set forth herein.

Based upon the budgets set forth in Exhibit "2" to the Gantes Declaration, Debtors believe that this Court should authorize Debtors' continued use of cash collateral in connection with their ongoing business operations.

II. **THE LENDERS DOES NOT HAVE AN INTEREST IN REVENUES GENERATED FROM DEBTORS' POST-PETITION SERVICES**

A restaurant generates revenue from two primary sources, the delivery of goods and the delivery of services. Although Lenders may have a lien on the food products, cash and other assets held by Debtors as of the Petition Date, and this lien will extend to the "proceeds" of this collateral post-petition, it will not extend to the cash generated from the "services" component of Debtors' businesses. See 11 U.S.C. § 552(b). The cash from services is "after acquired property" and remains free and clear of the Lenders's liens. <u>In re Skagit Pacific Corporation</u>, 316 B.R. 330 (B.A.P. 9th Cir. 2004). ("Furthermore, revenue generated by the operation of a debtor's business, post-petition, is

4    EMERGENCY MOTION RE
CASH COLLATERAL

275721.1

not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance." In re Cafeteria Operators, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003). Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest. Id.; In re Cafeteria Operators, L.P., 299 B.R. 400 (Bankr. N.D. Tex. 2003) (bank's lien only reach value of inventory sold not sale increment attributable services); In re Timothy Dean Restaurant & Bar, 342 B.R. 1 (Bankr. D.C. 2006). Accordingly, all revenues generated by Debtors over and above the cost of the inventory sold are not "cash collateral." See also, In re Texas Tri-Collar, Inc., 29 B.R. 724 (Bankr. W.D. La. 1983) (pursuant to Section 552, a creditor's pre-petition blanket lien does not extend to post-petition receivables); In re Delbridge, 61 B.R. 484 (Bankr. E.D. Mich. 1986) (pre-petition security interest in accounts receivables does not extend to post-petition receivables by operation of § 552); In re Big Hook Land & Cattle Co., 81 B.R. 1001 (Bankr. D. Mont. 1988) (post-petition increases in cattle herd through calf crop are not subject to lien resulting from after-acquired property clause in security agreement and are therefore cut off by § 552(a)); In re Transp. Design & Technology, Inc., 48 B.R. 635 (Bankr. S.D. Cal. 1985) (patent issued to debtor after filing petition does not constitute proceeds of pre-petition patent; it was instead after-acquired property and operation of § 552(a) cuts off creditor's interest); In re Hamilton, 18 B.R. 868 (Bankr.Colo. 1982) (crops planted after petition are after-acquired property and § 552(a) cuts off lien).

In this regard, the noted treatise on bankruptcy law, Collier on Bankruptcy, states as follows: "It must be emphasized that subsection (b)(1) creates an exception for proceeds, product, offspring or profits generated by pre-petition collateral, and not for 'after-acquired' property obtained by the debtor or the estate post-petition." Collier on Bankruptcy, 15th Ed. Revised, ¶ 552.02[1] (1998).

Here, although Lenders asserts liens against substantially all of the assets of Debtors, and on the proceeds generated from this collateral, it is important to recognize that a substantial part of Debtors' post-petition income will be cash generated from

services. Debtors' post-petition cash collections, to the extent that they are generated from post-petition services, constitute after-acquired property pursuant to Section 552(a) of the Bankruptcy Code, that is not subject to any of the exceptions provided for in Section 552(b) of the Bankruptcy Code. See, In re Bering Trader, Inc., 944 F. 2d 500, 502 (9th Cir. 1991); In re Days Inn California Riverside Limited Partnership, 27 F. 3d 374, 377 (9th Cir. 1994) ("The revenues derived from the sale of food and drink and from other services provided by the hotel generate "accounts" that cannot be classified as rent. The equitable purposes of bankruptcy and the balancing purpose of § 552 require us to distinguish the two types of revenues."); In re Everett Home Town Limited, 146 B.R. 453 (Bankr. D. Ariz. 1992) (cart fees, greens fees and restaurant revenues not cash collateral); In re McKim, 217 B.R. 97 (Bankr. D. R.I. 1998) (green fees are not cash collateral); See also, In re Hotel Sierra Vista Ltd. Partnership, 112 F.3d 429, 432 (9th Cir. 1997) ("Our decision in Days California provides the formula for determining the amount of revenues to which liens may survive post-petition. In Days California, we stated that Hotel methods of accounting will permit the identification of the revenues generated by the rooms and those generated by services. Determination of the net revenues will require allocation of direct and indirect expenses in proportion to each category of revenue. Thus, proving the extent of one's interest involves submitting evidence that enables the bankruptcy court to determine the sum to which the party asserting the security interest is entitled"). Accordingly, Debtors' adequate protection burden extends only to the limited value attributable to the accounts receivable and the cash on hand as of the Petition Date, and an allocation of the proceeds generated from the use of food inventory on hand as of the Petition Date. The value of this collateral pool and the proceeds thereof is very limited, and sufficient replacement collateral will be generated through Debtors' post-petition operations in order to provide to Lenders adequate protection of their interests therein.

### III. DEBTORS SHOULD BE AUTHORIZED TO USE ANY CASH COLLATERAL OF THE LENDERS PURSUANT TO 11 U.S.C. § 363

The provisions of Section 363(c)(2) of the Bankruptcy Code govern a debtor's use of cash collateral. Section 363 (c)(2) provides, in pertinent part, as follows:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral . . . unless:
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Therefore, a court may authorize a debtor's use of a creditor's cash collateral in the absence of creditor consent. See, 11 U.S.C. § 363(e).

Section 363(e) of the Bankruptcy Code provides that, upon the request of an entity that has an interest in property proposed to be used by the debtor, the court may prohibit or condition such use "as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

The Bankruptcy Code clearly delineates the party which bears the burden of proof on the relevant cash collateral issues:

> (1) the trustee [or debtor in possession] has the burden of proof on the issue of adequate protection; and
>
> (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

11 U.S.C. § 363(o).

Therefore, this Court may authorize Debtors' use of any cash collateral of the Lenders upon determining that the interests of the Lenders in the cash collateral will be adequately protected. In re McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988).

275721.1

### A. The Adequate Protection Burden

In the case of United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626 (1988), the United States Supreme Court analyzed and quantified the parameters of the "interest in property," referenced in Sections 361, 362(d)(1), and 363(e), which the Bankruptcy Code undertakes to protect, where required, through adequate protection. This analysis led the Supreme Court in Timbers to the conclusion that the "interest in property" referenced in the above sections of the Bankruptcy Code means, and is limited to, the "value of the Collateral." Timbers, 108 S.Ct. at 630. Therefore under the Timbers analysis, the adequate protection provisions in the Bankruptcy Code protects a secured creditor only from a potential diminution in the value of that creditor's collateral during the post-petition period. Id.

The "value" oriented adequate protection analysis adopted by the Supreme Court in Timbers has been closely adhered to by the courts which have subsequently had occasion to address this issue. See, e.g., In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (so long as the receivables being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security interest, the creditor is adequately protected); In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not entitled to adequate protection payments); In re Anderson, 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (secured creditor was required to show a necessity for adequate protection by demonstrating a decline in asset value from the petition date); In re Kessler, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under Timbers, movants are not entitled to adequate protection payments, as there was no showing that property was depreciating in value).

In the case of In re Elmore, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the Honorable Samuel Bufford held that:

1     [T]he Court finds that the property is not depreciating in value. In consequence, the
2 Court finds that Lomas [Secured Creditor] is adequately protected by the value of its
3 collateral . . . The right to receive payments is a simple contract right, that supports only a
4 claim in the bankruptcy case. There is no other adequate protection to which Lomas is
5 entitled under the Bankruptcy Code.
6 Elmore, supra, 94 B.R. at 677 (citation omitted).
7     In the case of In re McCombs, the Honorable John E. Ryan held that:
8     The analysis of the Supreme Court in Timbers is instructive here. The phrase
9 "interest in property" in § 363(e) means the value of the collateral. That is the interest that
10 I am required to protect. If that value is likely to diminish during the time of the use,
11 adequate protection must be provided by the Debtor.
12 McCombs, supra, 88 B.R. at 266 (emphasis added); accord, In re Delta Resources, Inc.,
13 54 F.3d 722, 730 (11th Cir.), cert. denied, 64 U.S.L.W. 3348 (1995); In re Westchase I
14 L.P., 126 B.R. 692, 694-95 (Banrk. W.D. N.C. 1991).
15     Under the strict value-oriented analysis adopted by the Supreme Court in Timbers
16 (and adhered to by the well-reasoned cases cited above), the adequate protection inquiry
17 under Section 363(e) is limited to determining whether the debtor's use of a secured
18 creditor's cash collateral will reduce the value of the creditor's collateral base. If the
19 debtor can establish that the proposed use of the collateral will not cause a decline in the
20 value of the collateral, then court authorization of such use is appropriate.
21     Not infrequently, a secured creditor will contend that it somehow has a right to be
22 paid adequate protection payments, post-petition, even where no decline in the value of
23 the collateral is either occurring or anticipated. The Supreme Court in Timbers expressly
24 rejected this very contention stating:
25     It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to
26 immediate payment of the principal of his collateral) that this "realization" is to "result" not
27 at once, but only upon completion of the reorganization. It is then that he must be
28 assured "realization . . . of the indubitable equivalent" of his collateral.

*Timbers*, 108 S.Ct. at 633.

The law, then, is clear: no adequate protection payments are required unless there is a decline post-petition in the value of the secured creditor's collateral which actually impairs the creditor's secured claim. As set forth in detail below, and as evidenced by the Gantes Declaration, Debtors' proposal to use any cash collateral of the Lenders provides adequate protection to the Lenders.

### B. Debtors Have Satisfied Their Adequate Protection Burden

#### 1. Lenders's Interests Are Adequately Protected by the Proposed Replacement Liens

Under Debtors' cash collateral proposal, Lenders's interests in any cash collateral will be adequately protected from a diminution in value through replacement liens granted to Lenders and through the maintenance and preservation of Debtors' businesses.

Under Debtors' proposal, each Lenders will be granted a post-petition replacement lien on cash, accounts receivable, inventory, and proceeds acquired and/or generated with any cash collateral with a value equal to the amount of any pre-petition cash collateral expended by each of the respective Debtors. For example, if a Debtor uses $100,000 of pre-petition cash collateral, the relevant Lenders will be granted a lien, to the extent of $100,000, in the proceeds of the cash collateral.

However, since the function of adequate protection is only to preserve and not to increase the collateral subject to a secured creditor's interest, any additional value created through Debtors' use of the cash collateral, whether in the form of inventory, accounts receivable or cash, will not be subject to a replacement lien, but will instead constitute an asset of the estate that all creditors will ultimately be able to look for payment. See *Ledgemore*, supra, 116 B.R. at 343 (so long as the receivables being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security interest, the creditor is adequately protected). Thus, Lenders's replacement liens should be limited to the amount of any cash collateral in existence as of the Petition Date.

Although the replacement lien will, in concept, ensure the preservation of Lenders's interests in the cash collateral, in reality, the liens will perform this function only if Debtors, in fact, generate at least one dollar of value for every dollar of cash collateral expended. The evidence that addresses this issue is contained in the Gantes Declaration and specifically each of the budgets, which are attached collectively as Exhibit "2" to the Gantes Declaration. The budgets indicate that Debtors will operate on a cash flow positive basis during the budgeted period, and that their assets will increase in value during such period.

Debtors believe that the projections of their business operations as set forth in the budgets are reasonable. As set forth in the Gantes Declaration, the business assumptions underlying the operations projected in the budget are reasonable and are essentially in accordance with Debtors' historical experience, as adjusted to take into account recent or projected events (e.g., the recent downturn in the economy). Accordingly, Debtors believe that the budgets establish that the proposed replacement liens being granted to Lenders will adequately protect the Lenders's alleged interests.

In summary, the Gantes Declaration provides evidence to establish with reasonable certainty that Debtors' use of any cash collateral of the Lenders will result in an increase in the estates' collateral pool, thereby adequately protecting the Lenders's interests in any cash collateral.

### 2. Lenders is Adequately Protected by the Maintenance and Preservation of Debtors' Businesses.

To determine the sufficiency of adequate protection, a bankruptcy court should: (i) establish the value of the secured creditor's interest; (ii) identify the risk, if any, to the value of the secured creditor's cash collateral resulting from the debtor's request for the use of the cash collateral; and (iii) determine whether the debtor's adequate protection proposal protects the value of the cash collateral as nearly as possible against risk to that value consistent with the concept of indubitable equivalence. McCombs, supra, 86 B.R. at 267 (quoting In re Martin, 761 F.2d 472 (8th Cir. 1985)).

275721.1

1     To establish the value of a secured creditor's interest, the bankruptcy court must consider the purpose of the valuation, and the proposed disposition or use of the secured property. See, 11 U.S.C. § 506(a). "One of the primary factors to be considered in valuation is whether the subject property is to be used and retained by the debtor or whether the property is to be disposed of." In re Kidsstop of America, Inc., 64 B.R. 397, 401 (M.D. Fla. 1986).

    Here, any cash collateral consists of, among other things, the daily receipts generated by the operations of Debtors' businesses. The value of any such cash collateral will depend, in part, upon the preservation of Debtors as going concerns. It follows that the risk to this going concern value of cash collateral (which risk is required to be identified by the Court in the McCombs test above) consists of any cessation in Debtors' business operations. See, In re Glasstream Boats, Inc., 110 B.R. 611, 612 (M.D. Ga. 1990) (it was in the best interest of both the debtor-in-possession and the creditor that the debtor "continue in its operation as a manufacturing facility" and that "denial of this motion would result in another shut down of the assembly line, which the court doesn't feel is in the best interest of either party."); In re Cann & Saul Steel Co., 76 B.R. 479, 483 (E.D. Pa. 1987) (continued operation of manufacturer debtor was in the best interest of secured creditor in that it was likely that the secured creditor would realize more funds than it would by requiring the debtor to cease operations); In re Stein, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (the bankruptcy court allowed a debtor to use cash collateral where the secured party had no equity cushion for protection, finding that the use of the cash collateral was necessary to the continued operations of the debtor, and that the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]"); In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to preserve the value of real property which also secured creditor's claim); In re Karl A. Neise, Inc., 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor

adequately protected by lien in post-petition property acquired by debtors; debtors can use cash collateral "in the normal operation of their business").

As discussed at length in the Gantes Declaration, even a temporary cessation of Debtors' ability to operate their businesses, caused by any lack of access to any cash collateral, will result in a substantial diminution of the Lenders's collateral, as customers will turn to competitors of Debtors for their dining needs. In contrast, maintenance of Debtors' ongoing operations will preserve the value of Lenders's interest in any cash collateral as nearly as possible against any risk to that value, thus providing adequate protection.

### IV.    DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL IN ORDER TO PROMOTE A SUCCESSFUL REORGANIZATION

In the case of In re O'Conner, 808 F.2d 1393 (10th Cir. 1987), the Tenth Circuit Court of Appeals recognized that the ultimate goal of Chapter 11 proceedings is to enhance the prospects of reorganization. In this regard, the Tenth Circuit stated as follows:

[T]he Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end . . . In order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard. Id. at 1397-98; accord, In re Dynaco Corp., 162 B.R. 389, 395 (Bankr. D.N.H. 1993) ("[T]he court will generally permit the business operations to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections . . ."); In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) ("At the beginning of the reorganization process the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization where the evidence is conflicting.").

13    EMERGENCY MOTION RE
CASH COLLATERAL

275721.1

Here, a determination to grant Debtors' use of any cash collateral will help promote Debtors' successful reorganization, as it will allow Debtors to continue, uninterrupted, the normal operations of their businesses. Debtors' efforts to successfully reorganize their financial affairs, in turn, will be to the ultimate benefit of the Lenders, by preserving and enhancing the value of their alleged secured interests. In Cann & Saul, supra, the court found the debtor's prospects for a successful reorganization to be a major factor in determination of adequate protection:

It is far more significant in the weight of considerations as to whether a creditor is "adequately protected" to analyze debtor's prospects for a successful reorganization in Chapter 11. If these prospects are strong . . . then the measure of the secured creditor's adequate protection is the probability that the debtor will be able to propose an effective plan. Cann & Saul, 76 B.R. at 485.

In Cann & Saul, the debtor (a steel manufacturer that had been in business for almost a century) had been losing money each year for a period of at least four years prior to the filing of its Chapter 11 petition. However, the court found that the debtor had strong potential for reorganization, given such factors as the debtor's production of high quality product, the debtor's stability and good public image, and the debtor's acceptance of changes necessary for maintaining its labor force. Id. at 487-88.

Similarly here, Debtors have a strong potential for a successful reorganization. Debtors have operated profitably since their inception. Debtors' businesses generally have been successful, have a good public image, and possess a good customer base. Debtors' management has extensive experience in Debtors' industry, has won many awards for its managerial skills, and is committed to continuing to make, changes necessary to enhance the reorganization of Debtors. Debtors have employed Trinity Capital to assist in Debtors' efforts to recognize their financial affairs. Debtors' efforts to reorganize, therefore, will contribute to the adequate protection of Lenders's interests, and support authorizing Debtors' use of any cash collateral.

1  If Debtors are denied use of cash collateral, in all likelihood they will be forced to
2  close their businesses and to cease operations. Such a cessation of operations, even
3  temporarily, would cause irreparable damage to Debtors' businesses in the form of
4  customer defections, employee attrition, lost revenues and loss of goodwill. If Debtors
5  were permanently prohibited from using cash collateral, they would be forced to close
6  operations, and their assets would need to be liquidated, yielding proceeds totaling a
7  fraction of what Debtors could generate by continuing operations and reorganizing their
8  financial affairs. Rather than force Debtors and their creditors to such a result at this early
9  stage of the cases, the Court should permit Debtors to use any cash collateral in order to
10 preserve their ability to reorganize. See, In re George Ruggiere Chrysler-Plymouth, Inc.
11 727 F.2d 1017, 1019 (11th Cir. 1984) ("Without the availability of cash to meet daily
12 operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring
13 rehabilitation over economic failure would be frustrated."); Dynaco, 162 B.R. at 396
14 (finding that the alternative to the debtor's use of cash collateral – forced termination of its
15 businesses – would doom any reorganization and any chance to maximize values for all
16 creditors).

17 **V.    GOOD CAUSE EXISTS FOR HEARING THIS MOTION ON AN**
18 **        EMERGENCY BASIS**

19  In recognition of the fact that Section 363(c) of the Bankruptcy Code operates to
20 deprive a debtor of the use of critical operating capital as of the filing of the debtor's
21 Chapter 11 petition, Congress specifically provided in Section 363(c)(3) that a hearing on
22 cash collateral "shall be scheduled in accordance with the needs of the debtor."
23 Accordingly, the Bankruptcy Code expressly anticipates and authorizes expedited
24 hearings on the issue of cash collateral use. See, 11 U.S.C. § 363(c)(3).
25  Similarly, the Ninth Circuit Court of Appeals has recognized that immediate interim
26 relief may be crucial to the success of a corporate reorganization:
27  We realize that 'in certain circumstances, the entire reorganization effort may be
28 thwarted if emergency leave is withheld' and that reorganization under the Bankruptcy

1  Code 'is a perilous process, seldom more so than at the outset of the proceedings when
2  the debtor is often without sufficient cash flow to fund essential business operations.' It is
3  for this reason that Congress specified that hearings concerning the use of cash collateral
4  'shall be scheduled in accordance with the needs of the debtor.'
5  In re Center Wholesale, Inc., 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (emphasis
6  added) (citations omitted); see also, In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr.
7  D.Me. 1980).
8       In this case, Debtors employ collectively approximately 230 employees in their
9  operations. As set forth in the Gantes Declaration, Debtors must have the immediate use
10 of any cash collateral to meet payroll obligations (which must be paid on November 26,
11 2008) to meet the daily costs and expenses of operating their businesses, to promptly pay
12 their vendors, and to acquire goods and services to keep their businesses operating. Any
13 delay in Debtors' ability to meet one or more of the aforementioned operating needs could
14 deprive Debtors of their ability to successfully reorganize their financial affairs.

15 **VI.   THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS MOTION AS**
16      **SOON AS POSSIBLE IN ACCORDANCE WITH THE REQUIREMENTS OF THE**
17      **BANKRUPTCY RULES**

18      By this Motion, Debtors are requesting that the Court schedule a final hearing on
19 this Motion as soon as possible in accordance with the requirements of the Federal Rules
20 of Bankruptcy Procedure.
21      Rule 4001 of the Federal Rules of Bankruptcy Procedure provides that the Court
22 may commence a final hearing on this Motion no earlier than fifteen (15) days after
23 service of the Motion. Debtors need to obtain as promptly as possible approval of the final
24 use of cash collateral in order to ensure Debtors' employees and vendors that Debtors will
25 be able to pay, during the course of these cases, their ordinary operating expenses
26 including, without limitation, payroll and the expenses of maintenance and operation of
27 their businesses. A final hearing on this Motion should be held as soon as possible after
28 the expiration of the fifteen (15) day period provided for by Rule 4001 of the Federal Rules

of Bankruptcy Procedure, in order to prevent the substantial damage to Debtors' businesses which would result from any loss of support of Debtors' customers, employees and vendors caused by a lack of confidence that Debtors will have the ability to use cash collateral during their cases.

## VII. THE NOTICE OF THIS MOTION PROPOSED TO BE GIVEN TO CREDITORS AND OTHER PARTIES-IN-INTEREST IS APPROPRIATE UNDER THE FACTS AND CIRCUMSTANCES OF DEBTORS' CASES

As of the filing of this Motion, no trustee, examiner or Committee has been appointed in Debtors' Chapter 11 cases. In accordance with the provisions of Bankruptcy Rule 4001(b)(1), notice of this Motion has been given via facsimile, hand delivery or overnight mail to the Office of the United States Trustee, to Lenders, their counsel of record, and to each of Debtors' twenty largest general unsecured, non-insider creditors.

Because of the exigencies of Debtors' cases and the irreparable harm to Debtors, their Chapter 11 estates, and all parties-in-interest that will ensue if the relief requested herein is not granted, Debtors submit that no further notice need be given. No previous motion for the relief sought herein has been made to this or to any other court.

## VIII. CONCLUSION

Based upon the foregoing, Debtors respectfully request that this Court enter its order:

1. Finding that Lenders's interests in any cash collateral are adequately protected;

2. Authorizing, on an interim basis pending final hearing on notice to creditors, Debtors' immediate use of any cash collateral of the Lenders pursuant to the terms and conditions contained in this Motion;

3. Setting a final hearing on this Motion; and

4. Granting to Debtors such other and further relief as the Court may deem just and proper.

1 | Dated: November 25, 2008        WEILAND, GOLDEN
                                     SMILEY, WANG EKVALL & STROK, LLP

                                     By: /s/ Reem Bello
                                     REEM J. BELLO
                                     Proposed Insolvency Counsel for
                                     RSM BFS Partners, a California
                                     limited partnership, Debtor and
                                     Debtor-in-Possession

275721.1